FILED

$S \in \rho$ 9, 2008

SEP 0 9 2008

RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 07 CR 799  −18 |
| | ) | |
| vs. | ) | Judge Ronald A. Guzman |
| | ) | |
| ROBERTO VALDEZ | ) | |

### PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant ROBERTO VALDEZ, and his attorney, WILLIAM O. WALTERS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C) and Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2.     The indictment in this case charges defendant with conspiracy to knowingly and intentionally distribute and possess with intent to distribute controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of 3,4-methylenedioxymethamphetamine (commonly known as "Ecstasy" or "MDMA"), a Schedule I Controlled Substance, and more than 100 kilograms of mixtures containing marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2 (Count One); and knowingly and intentionally distributing 50 grams or more of mixtures containing a detectable amount of methamphetamine, a

Schedule II Controlled Substance, and quantities of MDMA, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2 (Counts Ten and Eleven).

3.    Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Charge to Which Defendant is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the indictment. Count One charges defendant with conspiring to distribute and possess with intent to distribute mixtures containing more than 50 grams of mixtures containing a detectable amount of methamphetamine and quantities of MDMA, and mixtures containing marijuana, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

### Factual Basis

6.    Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline §1B1.3:

Between no later than in or about Summer 2004, and continuing until in or about January 2005, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant ROBERTO VALDEZ ("VALDEZ") conspired with Ivan Myint, Michael

Cruz ("Cruz"), Jorge Huerta ("Huerta"), Jerry Left ("Left"), Hubert Chow ("Chow"), Kenneth Quoc Luong ("Luong") and others known and unknown to knowingly and intentionally possess with the intent to distribute and distribute controlled substances, namely, more than 50 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of MDMA, a Schedule I Controlled Substance, and mixtures containing marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

<u>Participation in Ivan Myint's Drug Trafficking Operation</u>

In approximately Spring 2004, VALDEZ was a tattoo artist who worked as an apprentice to Cruz. Around Spring 2004 or early Summer 2004, Cruz introduced VALDEZ to Ivan Myint. Based upon discussions that VALDEZ had with both Cruz and Ivan Myint, VALDEZ learned that Ivan Myint was a drug trafficker who sold various controlled substances, including MDMA and hydroponic marijuana. Ivan Myint offered VALDEZ a job working for Ivan Myint's drug trafficking operation and VALDEZ agreed to work for Ivan Myint.

Beginning in or about Summer 2004, VALDEZ began delivering hydroponic marijuana to Ivan Myint's drug customers at Ivan Myint's direction. Soon thereafter, VALDEZ began to collect from Ivan Myint's customers cash (hereinafter "narcotics cash proceeds") that the customers owed to Ivan Myint for drugs that those customers had purchased from Ivan Myint. The amount of narcotics cash proceeds that VALDEZ collected was, on average, $5,000 to $10,000 per occasion. After picking up narcotics cash proceeds, VALDEZ, again at the direction of Ivan Myint, delivered the narcotics cash proceeds back to Ivan Myint or another individual. Most often, VALDEZ picked up the

-3-

drugs from, and delivered narcotics cash proceeds to, Left, who kept track of drug deliveries and the drug debts owed by the customers for the purchased drugs. Later, VALDEZ began to deliver MDMA to Ivan Myint's customers as well. On average, VALDEZ delivered drugs or picked up money for Ivan Myint 1-2 times per week from mid-2004 until January 2005 when Ivan Myint was arrested. On one occasion, VALDEZ and Left dropped off a large amount of money to Susan Chen and Su Jung Chen in Skokie, Illinois, as payment for drugs purchased by Ivan Myint from Luong.

During the time he worked for Ivan Myint, VALDEZ attended multiple meetings that were attended by members of Ivan Myint's drug trafficking "crew." The individuals who attended these meetings included Ivan Myint, Cruz, Left, Chow, Michael Myint, VALDEZ and Ivan Myint's wife. During these meetings, Ivan Myint and his crew often discussed matters concerning their drug trafficking. From the statements made during these meetings, VALDEZ learned that Ivan Myint was getting his drugs from Canadian sources.

In addition, Ivan Myint and Left instructed VALDEZ regarding steps that VALDEZ should take to avoid law enforcement detection. In addition to using code terms while referring to drugs or narcotics cash proceeds, VALDEZ was directed to also do the following: (a) not talk generally about the business with the drug customers; (b) pat down drug customers for law enforcement recording devices if he had concerns that a customer might be cooperating; (c) turn up the car radio during drug deals in order to defeat the recording of the conversation on a law enforcement recording device; and (d) inform Ivan Myint of the license plates of suspicious vehicles so that Ivan Myint could have his brother, who was a suburban police officer, check the license plates for Ivan Myint in a law enforcement database.

-4-

Also, during or about November 2004, at the direction of Ivan Myint, VALDEZ and Left used a homemade incendiary device resembling a "Molotov cocktail" to destroy the car of an individual (hereinafter "Former Crew Member A") who had formerly worked for Ivan Myint as a courier of narcotics and narcotics cash proceeds. Ivan Myint believed that Former Crew Member A had stolen money belonging to Ivan Myint and, therefore, in retaliation, Ivan Myint ordered Left and VALDEZ to "fire bomb" Former Crew Member A's car. Therefore, at Ivan Myint's direction, Left and VALDEZ traveled to the location of Former Crew Member A's car in Chicago. At that location, VALDEZ broke a window of the vehicle and threw the homemade incendiary device into the car. The device functioned as intended and initiated a fire inside the car, which ultimately led to the destruction of the car.

### November 2004 Delivery of 30,000 Pills Containing MDMA and Metamphetamine

In approximately early November 2004, VALDEZ traveled to Toronto, Canada, with Ivan Myint to meet Ivan Myint's Canadian drug source, who was Luong. During that meeting in Toronto, Luong agreed to sell MDMA to Ivan Myint for $4 per pill and to sell hydroponic marijuana to Ivan Myint for $2,400 per pound.

Soon after the meeting in Canada, Left told VALDEZ that Ivan Myint had ordered 30,000 MDMA pills from Luong. Later in November 2004, two of Luong's couriers delivered to the Chicago area the load of approximately 30,000 MDMA pills that Ivan Myint had purchased from Luong. Ivan Myint had arranged to sell 10,000 MDMA pills from that load to Huerta. Ivan Myint instructed Left and VALDEZ to meet with the couriers and then escort them to meet Huerta so that Huerta could take possession of 10,000 of the MDMA pills and give the remaining pills to Left and VALDEZ. As directed by Ivan Myint, Left and

VALDEZ traveled to a Chicago suburb and met with Luong's couriers, who had the approximately 30,000 MDMA pills secreted in a compartment of the vehicle the couriers were driving. They all then met with Huerta who was driving a separate vehicle. Huerta, Left, VALDEZ and the Canadian couriers then drove in their respective vehicles to a garage on the north side of Chicago. Inside the garage, Huerta removed 10,000 MDMA pills from the load and then gave the remaining approximately 20,000 MDMA pills to Left and VALDEZ. At Ivan Myint's direction, Left then brought the remaining approximately 20,000 MDMA pills to Left's residence.

Later in November 2004, Ivan Myint arranged to sell 1,000 MDMA pills to an individual ("CS1") who, then unbeknownst to Ivan Myint, was cooperating with law enforcement in the investigation of Ivan Myint and his drug trafficking operation. Ivan Myint negotiated the sale of the pills to CS1 for a price of $5 per pill, for a total price of $5,000. Ivan Myint assigned to VALDEZ the task of delivering the MDMA pills to CS1. VALDEZ obtained the MDMA from Left prior to the delivery of the pills to CS1.

The delivery of the pills to CS1 happened in two steps. First, on November 22, 2004, VALDEZ met with CS1 at a car wash on Lawrence Avenue in Chicago and provided to CS1 approximately 500 MDMA pills. At that time, CS1 did not exchange any money for the MDMA pills. The following day, on November 23, 2004, VALDEZ delivered to CS1 the remaining 500 MDMA pills on a street on the north side of Chicago. In exchange, CS1 then gave to VALDEZ $5,000 in purchase money for all of the MDMA pills provided to CS1 by VALDEZ. At Ivan Myint's direction, VALDEZ then took the narcotics cash proceeds and provided the narcotics cash proceeds to Ivan Myint. Subsequent laboratory analysis verified that the pills provided to CS1 on November 22, 2004, and November 23, 2004,

-6-

consisted, in total, of (a) approximately 1,003 tablets containing MDMA and methamphetamine with a net weight of 218.29 grams; and (b) approximately 5 tablets containing methamphetamine with a net weight of 1.56 grams.

<u>November 2004 Delivery of 100 Pounds of Hydroponic Marijuana</u>

Later in November 2004, based upon his conversations with Ivan Myint and Left, VALDEZ became aware that Left had received a load of approximately 100 pounds of hydroponic marijuana that Ivan Myint had purchased from Luong. At Ivan Myint's direction, VALDEZ assisted in the trafficking of that hydroponic marijuana to various drug customers of Ivan Myint and the collection of narcotics cash proceeds from several of those customers.

<u>December 2004 Delivery of 30,000 Pills Containing MDMA</u>

In approximately mid-December 2004, based upon his conversations with Cruz, VALDEZ became aware that Ivan Myint had purchased an additional 30,000 MDMA pills from Luong. Soon thereafter, but also in approximately mid-December 2004, two of Luong's couriers delivered to the Chicago area a load of approximately 30,000 MDMA pills that Ivan Myint had purchased from Luong. Ivan Myint instructed Cruz and VALDEZ to meet with the couriers, obtain the MDMA pills and then deliver the MDMA pills to Left's residence for safe keeping while arrangements were made to sell the 30,000 MDMA pills to Ivan Myint's various drug customers. As directed by Ivan Myint, Cruz and VALDEZ then traveled to a location inside Chicago and met with Luong's couriers, who had the approximately 30,000 MDMA pills secreted in a compartment of the vehicle the couriers were driving. At Cruz' direction, Cruz and VALDEZ then led the couriers to Cruz' residence on the north side of Chicago so that the couriers could remove the MDMA pills from the

vehicle. Cruz and VALDEZ initially waited outside the garage but the couriers eventually exited the garage and asked Cruz and VALDEZ for help removing the MDMA pills from the vehicle. VALDEZ watched as Cruz removed the door panels from the vehicle in order to access the MDMA pills, which were secreted behind the door panels of the vehicle. After removing the door panels, Cruz and the couriers were able to remove the approximately 30,000 MDMA pills.

After the pills were removed from the vehicle, in accordance with Ivan Myint's direction, Cruz and VALDEZ drove to Left's apartment and attempted to deliver the MDMA pills to Left, but Left refused to accept them. VALDEZ then stored the pills in his residence overnight. The following day, Ivan Myint then directed VALDEZ to transport the pills to the residence of Michael Myint, who is Ivan Myint's brother. VALDEZ then drove to Michael Myint's condominium building in Chicago. Inside of Michael Myint's condominium unit, VALDEZ gave the approximately 30,000 MDMA pills directly to Michael Myint. The pills were in clear heat-sealed bags and Michael Myint inspected the bags of MDMA pills at the time that he received them from VALDEZ.

On four or five occasions thereafter, VALDEZ picked up MDMA pills from Michael Myint for delivery to Ivan Myint's drug customers. On each such occasion, VALDEZ met with Michael Myint inside Michael Myint's condominium and then Michael Myint would count out the appropriate number of MDMA pills and give them to VALDEZ for deliver to Ivan Myint's customers.

On January 12, 2005, Ivan Myint convened a meeting at a Chicago restaurant between Ivan Myint, Cruz, VALDEZ and Chow. During that meeting, Ivan Myint informed Cruz, VALDEZ and Chow that Ivan Myint had arranged for the sale of 10,000 MDMA pills

-8-

to CS1 and that the deal would conclude that evening.  VALDEZ was informed that Cruz was in charge of arranging for the delivery of the MDMA pills to CS1 and assuring payment by CS1 for the pills.  Later on January 12, 2005, Cruz instructed VALDEZ to be ready to receive 10,000 MDMA pills from Cruz for delivery to CS1.  VALDEZ prepared to receive the 10,000 MDMA pills from Cruz.  Later, however, Cruz contacted VALDEZ and told VALDEZ that the deal had been canceled by Ivan Myint due to Ivan Myint's concern about a suspicious vehicle on the street near his residence.  I have to admit that, during the preparation of this statement with the government, I initially denied taking part in the firebombing of the car with Jerry.  It was dumb of me to lie, especially since the prosecutor and the agents and my lawyer repeatedly told me to tell the whole truth.  I shouldn't have lied, but I felt bad about doing the firebombing and it was just hard to admit that I did it.  I am not lying about anything else in this statement.

### Flight With Cruz and Ivan Myint to Avoid Prosecution

On January 18, 2005, Ivan Myint was arrested by law enforcement officers and questioned regarding his drug trafficking activity.  Ivan Myint agreed to cooperate with the government in its continuing investigation.  In particular, Ivan Myint agreed to cooperate against his Canadian drug sources as well as the other members of his drug trafficking crew.

On or about January 19, 2005, at the direction of law enforcement officers, Ivan Myint contacted VALDEZ and instructed VALDEZ to meet with Ivan Myint, Cruz and Chow at a pool hall and bar in Chicago, Illinois.  Ivan Myint was then provided with a recording device by law enforcement officers and transported to the pool hall.  Inside the  pool hall, Ivan Myint met with Cruz, VALDEZ and Chow.  Outside the presence of law enforcement

-9-

officers, Ivan Myint indicated to Cruz, VALDEZ and Chow that Ivan Myint was wearing a recording device and, in a manner to defeat the recording of his statements, Ivan Myint further instructed Cruz, VALDEZ and Chow to not say anything incriminating while speaking with Ivan Myint.

On or about January 26, 2005, Ivan Myint directed Cruz, VALDEZ and Chow to meet with Ivan Myint at a fast food restaurant in Chicago. VALDEZ drove with Cruz to the meeting, which was also attended by Ivan Myint, Michael Myint, Chow and Ivan Myint's wife. During the meeting, Ivan Myint informed the individuals gathered at the meeting that, in fact, Ivan Myint had been arrested by law enforcement officers and had falsely led those law enforcement officers to believe that Ivan Myint was willing to cooperate fully with law enforcement in its continuing investigation. Ivan Myint further stated that he intended to flee to Mexico to avoid prosecution, although he expected his drug trafficking operation to continue, primarily using Chow to coordinate future drug operations.

During the meeting at the restaurant, Ivan Myint also informed all individuals gathered for the meeting that CS1 had cooperated against Ivan Myint and his drug trafficking crew. Ivan Myint informed Cruz and VALDEZ that law enforcement had obtained evidence against both Cruz and VALDEZ and suggested that Cruz and VALDEZ flee to Mexico with him. Both Cruz and VALDEZ agreed to flee to Mexico with Ivan Myint. During the meeting, Michael Myint provided to Ivan Myint with a copy of Michael Myint's Illinois driver's license so that Ivan Myint could assume Michael Myint's identity if Ivan Myint was questioned by any officials during the course of his flight to avoid prosecution. Michael Myint provided Ivan Myint with cash to assist him in his flight to Mexico.

Ivan Myint, Cruz and VALDEZ then traveled in a car to Mexico. While in Texas, the car was curbed for a traffic violation. During the pullover, Ivan Myint claimed to be Michael Myint and provided Michael Myint's Illinois driver's license to the law enforcement officer who curbed the defendants' vehicle. The law enforcement officer allowed the three defendants' to continue on their trip. The three defendants then traveled to Cuernavaca, Mexico, and made contact with some of Huerta's relatives who, for a period of time, provided them with accommodations. VALDEZ eventually returned to the United States from Mexico.

The amount of drugs that the government can prove to have been involved in VALDEZ' offense is at least 14,750 grams of mixtures containing MDMA, 220 grams of mixtures containing methamphetamine and 45.45 kilograms of mixtures containing marijuana.

7.    The foregoing facts are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

### Maximum Statutory Penalties

8.    Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.    A maximum sentence of 40 years' imprisonment, and a statutory mandatory minimum sentence of 5 years. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $2,000,000. Defendant further understands

-11-

that the judge also must impose a term of supervised release of at least four years, and up to any number of years, including life.

b.     In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

9.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2007 Guidelines Manual.

b.     **Offense Level Calculations.**

i.     Pursuant to Guideline §§ 2D1.1(a)(3) and (c)(3), the base offense level is 34 because defendant's offense including relevant conduct involved approximately 14,750 grams of mixtures containing MDMA, approximately 220 grams of mixtures containing meth and approximately 45.45 kilograms of marijuana, which, pursuant to Guideline § 2D1.1(c) (drug equivalency table), is equivalent to approximately 7,860.45

-12-

kilograms of marijuana.

> ii. Pursuant to Guideline § 2D1.1, a two-level increase is appropriate because a dangerous weapon was possessed during the offense.

> iii. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

> iv. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

> c. **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 2 and defendant's criminal history category is II:

> i. On or about April 14, 1999, defendant was convicted in Hidalgo County, Texas, of failing to identify a fugitive from justice and sentenced to 15 days

imprisonment, resulting in one criminal history point pursuant to Guideline § 4A1.1(c).

        ii.      On or about September 9, 1999, defendant was convicted in Hidalgo County, Texas, of misdemeanor assault resulting in injury and sentenced to one year probation, resulting in one criminal history point pursuant to Guideline § 4A1.1(c).

        d.     **Anticipated Advisory Sentencing Guidelines Range.**  Therefore, based on the facts now known to the government, the anticipated offense level is 33, which, when combined with the anticipated criminal history category of II, results in an anticipated advisory Sentencing Guidelines range of 151 to 188 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 5 years' imprisonment.

        e.     Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Plea Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

-14-

f.    Both parties expressly acknowledge that this Plea Agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines.   The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

## Cooperation

11.    Defendant agrees he will fully and truthfully cooperate with the United States Attorney for the Northern District of Illinois in any matter in which he is called upon to cooperate. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding.   Only the United States Attorney for the Northern District of Illinois may require defendant's cooperation pursuant to this Plea Agreement.   Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

12.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1 and

18 U.S.C. § 3553(e), to depart from the applicable Guideline range and statutory minimum sentence and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range and statutory minimum sentence rests solely with the Court.

13.    If the government moves the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence, as set forth in the preceding paragraph, this Plea Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable guidelines range or the statutory minimum sentence, whichever is greater. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting this Plea Agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from this Plea Agreement.

14.    If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence, as set forth above, this plea agreement will not be governed, in any part, by Federal Rule of Criminal Procedure 11(c)(1)(C), the preceding paragraph of this plea agreement will be inoperative, and the Court shall impose a sentence taking

into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e).

15.　　Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.　　After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment and the forfeiture allegation as to this defendant.

### Presentence Investigation Report/Post-Sentence Supervision

17.　　Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

18.　　Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information,

-17-

or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

19.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced.    Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

20.    This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 799.

21.    This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Plea Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim,

-18-

demand or cause of action it may have against defendant or any other person or entity. The obligations of this Plea Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Plea Agreement.

### Waiver of Rights

22.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.    The trial could be either a jury trial or a trial by the judge sitting without a jury.  Defendant has a right to a jury trial.  However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.    If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random.  Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant

-19-

guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.      At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.      At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.      **Waiver of appellate and collateral rights.**  Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section

1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation, nor does it apply to a request by defendant pursuant to Sentencing Guideline §1B1.10 and 18 U.S.C. § 3582(c) for a reduction of sentence as a result of an amendment to the Sentencing Guidelines applicable to defendant and expressly made retroactive by the United States Sentencing Commission.

    c.  Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Other Terms

23.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

24.    Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

25.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Plea Agreement.    Defendant further understands that in the event he violates this Plea Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Plea Agreement, or may move to resentence defendant or require defendant's specific performance of this Plea Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Plea Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of such prosecutions.

26.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

27.    Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney.  Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: ___9-9-08___


_____
PATRICK J. FITZGERALD
United States Attorney

_____
ROBERTO VALDEZ
Defendant

_____
TIMOTHY J. CHAPMAN
Assistant United States Attorney

_____
WILLIAM O. WALTERS
Attorney for Defendant